

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00302-CV

_____

IN THE INTEREST OF R.R.K., A CHILD

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. 20-4038-362

---

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

In two points of error, Appellant B.R. (Mother) complains about the trial court's April 2017 Order in Suit to Modify Parent-Child Relationship (Modification Order), which modified the August 2014 order (Parentage Order) adjudicating Appellee T.K. (Father) as the father of R.R.K. (Daughter). In her first point, Mother contends that the trial court abused its discretion by modifying the Parentage Order regarding conservatorship, possession, child support, and medical support because the evidence was factually insufficient to show a material and substantial change in the parties' circumstances. In her second point, she contends that the evidence is factually insufficient to support a finding that the modifications were in Daughter's best interest. Because we hold that the trial court did not abuse its discretion by modifying the Parentage Order as to conservatorship, possession, and Father's support obligation but that the evidence was factually insufficient to support the modification as to Mother's support obligation, we affirm in part and reverse in part.

## I. Procedural History

Father filed a petition to establish paternity less than a month before Daughter's September 2013 birth. On July 20, 2014, he and Mother signed a mediated settlement agreement (MSA). The trial court signed the Parentage Order in August 2014. The parties stipulated that the order was "a merger" of their MSA but that the order trumped the MSA in cases of "any differences." In the order, the parents were appointed joint managing conservators (JMCs). Mother was awarded the exclusive

rights to designate Daughter's primary residence and to receive child support. The order provided that Daughter would "attend the school associated with [Mother's] residence so long as she resides within Frisco I.S.D., unless the parties" agreed in writing otherwise. Father's child support was set at $1,800 monthly. Both parties were ordered to provide medical support. Father was ordered to provide health insurance, and each parent was ordered to pay 50% of uninsured medical expenses.

Possession was as mutually agreed by the parents in advance and otherwise as provided by the order. According to the order, for the period after Daughter's second birthday until she started school, Father's weekly possession was from Wednesday at 3:00 p.m. until Friday at 9:00 a.m., and every other weekend from Friday at 3:00 p.m. until Monday at 9:00 a.m. After Daughter began school, Father's weekly possession would be from Wednesday when school dismissed until Friday when school resumed, and his possession every other weekend would begin when school dismissed on Friday and end when school resumed the following Monday. His summer possession was every other two weeks until August 15. During his extended Christmas possession, Mother was awarded possession on Christmas Eve from 2:00 p.m. to 9:00 p.m., and during Mother's extended Christmas possession, Father was awarded possession on Christmas Day from 2:00 p.m. to 9:00 p.m.

In the order, a parenting facilitator, Linda Rollins-Threats, was appointed. The parents were also permanently enjoined from being intoxicated while in possession of Daughter, using or taking illegal drugs at any time, making disparaging remarks about

3

the other parent within Daughter's hearing, and discussing with her in a negative way the topics of the other parent or spending time with the other parent. The Parentage Order also had a morality clause, a right of first refusal clause, and a proviso that the parents communicate via Our Family Wizard (OFW).

In December 2014, the Attorney General of Texas filed a motion to confirm a child support arrearage of more than $9,000. In January 2015, the arrearage was confirmed as zero, but Father was ordered to pay court costs.

In February 2015, less than a year after signing the MSA, Father filed a petition to clarify or modify the Parentage Order. He subsequently supplemented his petition. In his pleading, Father alleged that the parties had agreed and intended that Mother's residence would be restricted to Frisco ISD's attendance zone. Father requested that the trial court "construe and clarify the terms of [the Parentage Order] to make specific to restrict [Daughter's] domicile" to Frisco ISD's attendance zone. He also alleged that his, Mother's, or Daughter's circumstances had materially and substantially changed since the signing of the MSA. He further alleged that Mother had given him notice that she planned to move to Prosper and that this move violated the Parentage Order.

Father sought modification of the residence and domicile provisions "to more clearly define the geographic boundary consistent" with the parties' intent at mediation. Alternatively, he sought to be named the JMC with the exclusive right to designate Daughter's primary residence within Frisco ISD's attendance zone. He

additionally or alternatively requested that Daughter be required to attend Frisco ISD schools based on his residence and that Mother be permanently enjoined from removing Daughter (for the purposes of designating her residence) from Frisco ISD's attendance zone.

By the time of Father's supplemental petition, Daughter was already two years old, and thus the parties were under the Parentage Order's possession schedule that began when Daughter turned two. Father also sought to change that possession schedule to alternating weeks, to change the Christmas holiday schedule to the standard schedule under the Family Code, and to change the exchange times. He alleged that the Parentage Order was "unworkable due to the gap in exchanges": on the weekends when he had Daughter, he had her for Wednesday and Thursday but then was required to return her to Mother for a 9:00–3:00 period on Fridays before having her for the rest of the weekend.

Father sought to decrease child support because of material and substantial changes of "[t]he circumstances of the child or a person affected by the [Parentage] [O]rder" and requested that Mother be ordered to pay 50% of the medical insurance expenses. He also requested that the morality clause and right of first refusal clause be deleted. Mother filed a counterpetition alleging a material and substantial change of

circumstances of Daughter, Father, or Mother. However, she nonsuited her counterpetition the evening before trial.[1]

During the modification suit's pendency, the trial court signed a temporary order relating to possession and conservatorship. The order provided that Mother had the exclusive right to designate Daughter's residence "within ten (10) miles" of Father's house and that when Daughter reached school age, she had to attend school in Frisco ISD. It further provided that rather than surrender possession at the other parent's residence, Mother and Father had to surrender possession at Adventure Kids (a drop-in daycare) or at school, if Daughter was in school.

At trial, Mother, Father, Threats, Father's employee, and two of Father's former girlfriends testified about the merits of the case; each party's attorney testified about legal fees. The trial court granted the modifications and signed the Modification Order, awarding Father the exclusive right to determine Daughter's primary residence within Frisco ISD, an alternating weekly possession schedule during the school year, a 6:00 p.m. exchange time for out-of-school exchanges, and a standard Christmas holiday schedule.

Mother retained the exclusive right to receive child support, but the trial court reduced Father's monthly child support to $1,282.95 after offsetting an amount of support based on her income "because each party has equal possession of the child"

---

[1]About a year before the trial, the case was transferred to a newly created Collin County District Court, the 469th, effective September 1, 2015.

and also ordered Mother to pay Father cash medical support for reimbursement of health insurance premiums at $171.82 per month.

The trial court issued findings of fact and conclusions of law that summarized the evidence offered at trial, found "that there has been a material and substantial change," and summarized the modifications granted in the Modification Order. Mother appealed.[2]

## II. Standard of Review

We review the trial court's modification of orders governing conservatorship, possession, child support, and medical support for an abuse of discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g); *see In re J.E.*, No. 02-20-00105-CV, 2021 WL 2753550, at *8 (Tex. App.—Fort Worth July 1,

---

[2]Because the Modification Order was rendered by a Collin County district court, Mother originally appealed to the Dallas Court of Appeals. *See* Tex. Gov't Code Ann. § 22.201. That court dismissed Mother's appeal for want of jurisdiction, holding that an interim memorandum had been the trial court's final order and that Mother's appeal was untimely. *In re R.R.K.*, 581 S.W.3d 259, 262 (Tex. App.—Dallas 2017), *rev'd*, 590 S.W.3d 535 (Tex. 2019). The Texas Supreme Court reversed, holding that the trial court's April 25, 2017 order was the final order and that the appeal was therefore timely. *In re R.R.K.*, 590 S.W.3d at 544. The Supreme Court remanded the case to the Dallas Court of Appeals in January 2020. On remand, based on Daughter's having lived in Denton County for at least six months, Mother filed a motion to enforce and motion to transfer. The Collin County district court transferred the entire case to Denton County. The Dallas Court of Appeals then decided that it no longer had jurisdiction over the remanded appeal of the Modification Order and directed Mother to file a motion to transfer the appeal to our court. Mother filed the motion, the Dallas Court of Appeals referred the motion to the Texas Supreme Court, and the Supreme Court transferred the appeal to our court under its general authority under the Government Code. *See* Tex. Gov't Code Ann. § 73.001.

2021, pet. denied) (mem. op.) (applying standard to modification of possession); *In re R.M.*, No. 02-18-00367-CV, 2019 WL 2635566, at *3 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) (applying standard to modification of child support); *In re B.W.S.*, No. 05-15-01207-CV, 2016 WL 7163866, at *4 (Tex. App.—Dallas Nov. 28, 2016, no pet.) (mem. op.) (applying standard to modification of medical support); *In re A.B.H.*, 266 S.W.3d 596, 601 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g) (applying standard to modification of conservatorship). A trial court abuses its discretion if it acts arbitrarily or unreasonably or does not analyze or apply the law properly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

Whether the evidence supporting the decision is legally and factually sufficient is relevant in deciding whether the trial court abused its discretion. *T.D.C.*, 91 S.W.3d at 872. In determining whether an abuse of discretion has occurred because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? *In re C.F.*, 576 S.W.3d 761, 773 (Tex. App.—Fort Worth 2019, no pet.). The applicable sufficiency review comes into play in answering the first prong. *Id.* Concerning the second prong of our abuse-of-discretion inquiry, we resolve, based on the elicited evidence, whether the trial court's decision was reasonable. *Id.* A trial court does not abuse its discretion by basing its decision on conflicting evidence if some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex.

8

2009); *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding); *see In re E.P.C.*, 381 S.W.3d 670, 688 (Tex. App.—Fort Worth 2012, no pet.) (en banc) ("The evidence . . . is obviously conflicting, but we do not resolve the conflicts, for that is within the factfinder's province."). "As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (citations omitted).

In her two points, Mother challenges the factual sufficiency of the evidence supporting the trial court's decisions. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). With respect to the trial court's findings of facts and conclusions of law, they have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and, when (as here) the appellate record contains a reporter's record, an appellant may challenge those

9

findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

## III.  Substantive Law

### A.  Conservatorship and Possession

A court with continuing, exclusive jurisdiction over matters involving a child may modify an order that provides for the conservatorship of, or possession of and access to, that child if a preponderance of the evidence satisfies two grounds: a threshold statutory requirement and the child's best interest. Tex. Fam. Code Ann. § 156.001; *see id.* §§ 105.005, 156.101(a); *In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *3 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (mem. op.).

First, to meet the "threshold requirement," the movant must satisfy one of three statutory elements. *In re C.A.*, No. 10-16-00351-CV, 2021 WL 409621, at *8 (Tex. App.—Waco Feb. 3, 2021, no pet.) (mem. op.); *see also* Tex. Fam. Code Ann. § 156.101(a). In this case, Father was required to prove that his, Mother's, or Daughter's circumstances had "materially and substantially changed since" July 20, 2014, the date the MSA was signed. Tex. Fam. Code Ann. § 156.101(a)(1)(B); *see J.E.*, 2021 WL 2753550, at *3; *In re A.J.L.*, No. 14-16-00834-CV, 2017 WL 4844479, at *3 (Tex. App.—Houston [14th Dist.] Oct. 26, 2017, no pet.) (mem. op.); *cf. In re*

10

*Marriage of Harrison*, 557 S.W.3d 99, 139 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (op. on reh'g) (upholding trial court's modification in final decree of interim order based on MSA because evidence showed a material or substantial change in circumstances occurred after the signing of the MSA). One policy behind this requirement is "preventing constant re[ ]litigation with respect to a child." *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *20 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Another is to "create stability in the conservatorship." *In re H.P.J.*, No. 14-17-00715-CV, 2019 WL 1119612, at *4 (Tex. App.—Houston [14th Dist.] Mar. 12, 2019, no pet.) (mem. op.).

To determine whether a material and substantial change of circumstances has occurred when the parties had an MSA, the trial court compares the evidence of the conditions that existed at the time of the MSA's signing with the evidence of the existing conditions at the time of the modification trial. *See* Tex. Fam. Code Ann. § 156.101(a)(1); *cf. In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.) (stating in non-MSA case that starting point is the date of the order to be modified and ending point is the modification trial). The law does not prescribe any particular method for showing changed circumstances, and they may be established by circumstantial evidence. *In re E.A.D.P.*, No. 05-15-01210-CV, 2016 WL 7449369, at *2 (Tex. App.—Dallas Dec. 28, 2016, no pet.) (mem. op.); *A.L.E.*, 279 S.W.3d at 429.

11

A factfinder is not confined to rigid or definite guidelines; instead, the determination is fact specific and must be made according to the circumstances as they arise. *In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *6 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.); *A.L.E.*, 279 S.W.3d at 428. The statute "does not require a showing of a negative effect from the material and substantial change in circumstances, and the overriding best[-]interest[-]of[-]the[-]child standard takes into consideration whether a modification order is appropriate." *In re J.J.L., Jr.*, No. 04-12-00038-CV, 2012 WL 3985798, at *1 (Tex. App.—San Antonio Sept. 12, 2012, no pet.) (mem. op.); *see also In re J.R.L.*, No. 04-19-00049-CV, 2020 WL 2543315, at *3 (Tex. App.—San Antonio May 20, 2020, no pet.) (mem. op.).

The second and main ground that a movant must prove is that the modification is in the child's best interest. Tex. Fam. Code Ann. § 156.101(a); *In re A.E.A.*, 406 S.W.3d 404, 409 (Tex. App.—Fort Worth 2013, no pet.). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002.

Courts may use a nonexhaustive list of factors to determine a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *T.D.C.*, 91 S.W.3d at 873. Those factors include:

(A)     the [child's] desires . . . ;

12

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals . . . ;

(G)     the stability of the home[s];

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley*, 544 S.W.2d at 371–72 (citations omitted). Other factors to consider in modification suits include the child's stability and the need to prevent constant litigation in child-custody cases. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).

## B. Child Support and Medical Support

In this case, because both parties agree that the child support awarded in the Parentage Order was above the statutory guidelines, the trial court could modify the order only if the circumstances of Mother, Father, or Daughter had materially and substantially changed since the date of the Parentage Order's rendition,[3] *see* Tex. Fam. Code Ann. § 156.401(a-1), and only if the modification was in Daughter's best

---

[3]Neither party asserts, and nothing in the record suggests, that the trial court's ruling in the original parentage proceeding was made orally in court or in some other pre-Parentage-Order writing. *See* Tex. Fam. Code Ann. § 101.026. Accordingly, the Parentage Order was rendered when the trial court signed it. *See id.*

13

interest. *See id.* § 156.402; *see also Iliff*, 339 S.W.3d at 81 ("[I]n child support decisions, the 'paramount guiding principle' of the trial court should always be the best interest of the child."); *In re of S.C.*, No. 02-17-00377-CV, 2018 WL 5289370, at *3 (Tex. App.—Fort Worth Oct. 25, 2018, no pet.) (mem. op.). Father had the burden to show a material and substantial change in circumstances. *See In re K.F.*, No. 02-18-00187-CV, 2018 WL 6816119, at *4 (Tex. App.—Fort Worth Dec. 27, 2018, pet. denied) (mem. op.); *In re P.C.S.*, 320 S.W.3d 525, 530 (Tex. App.—Dallas 2010, pet. denied). To determine whether Father met his burden, the trial court had to compare the circumstances at the time of the Parentage Order with those at the time he sought modification. *See In re K.F.*, 2018 WL 6816119, at *4; *In re Moore*, 511 S.W.3d 278, 283 (Tex. App.—Dallas 2016, no pet.); *In re C.C.J.*, 244 S.W.3d 911, 917 (Tex. App.—Dallas 2008, no pet.).

## IV. Analysis

In her first point, Mother contends that the trial court abused its discretion by modifying the Parentage Order regarding conservatorship, possession, child support, and medical support because the evidence was factually insufficient to show a material and substantial change in the parties' circumstances. In her second point, she contends that the trial court abused its discretion by modifying the Parentage Order because the evidence was factually insufficient to show that the modifications were in Daughter's best interest.

## A. Changing the Terms of Possession

### 1. Material and Substantial Change

Sufficient evidence supports the trial court's possession modification. Father testified that Daughter has a hard time with the exchanges and becomes upset when being dropped off at Adventure Kids, the daycare exchange location. When they first started the drop-offs, Father would have to spend ten or fifteen minutes "trying to literally pry [Daughter] off [his] neck." As Daughter got a little older, Father could "communicate and talk to her" about what was happening, but he testified that nevertheless the drop-offs were "still a challenge." During the drop-offs, Daughter cries and makes statements that she does not want him to leave and does not want to go to Mother, and Father thought that Daughter probably had the same difficulties when it was Mother's turn to drop off Daughter. Mother had previously expressed to Father that Daughter had a hard time with the schedule; text messages that Father introduced as exhibits included a text from Mother in which she told Father that Daughter had "thr[own] a massive fit when I tried to get her ready and didn't want to leave. Poor thing cannot even get settled in one home before she is shipped off to another." Father estimated that changing to a week-on/week-off schedule would "eliminate upwards to two or three hundred drop-offs between now and the time [Daughter] goes to school."

Father also testified that both parents had found the possession periods in the Parentage Order to be confusing and that consequently they had both accidentally

15

violated the order. Father also asserted that he and Mother had recurring conflicts and difficulty communicating and thus had difficulty coparenting amicably, and evidence of that kind of conflict can show a material and substantial change for purposes of modifying the possession schedule. *See, e.g.*, *In re C.M.C.*, No. 05-15-01359-CV, 2016 WL 7166415, at *6 (Tex. App.—Dallas Nov. 9, 2016, no pet.) (mem. op.).

To support his contention that he and Mother had conflict and that changing the possession schedule would reduce that conflict by reducing the number of times they needed to communicate, Father introduced copies of text messages exchanged between the two that were sent in August 2015. The messages began when Daughter vomited after Mother picked her up for her possession. Mother sent Father a text in which she asked what he had fed Daughter and stated that "[t]his is why [she] want[ed] [Father] to drug test"—because he "do[es]n't make good decisions ever with [his] life or [Daughter's]. So irresponsible!" She then accused him of living "the party lifestyle" and told him, "That's more important to you th[an] anyone including [Daughter]. Sad, I knew you would be this kind of dad." Father then replied with a message informing Mother about what he had fed Daughter ("chicken potatoes and mac & cheese" and a "snack of raisins and a glass of milk") and telling her to let him know if she needed him to do anything or to go get Daughter. In response, Mother told him to meet her at the hospital. When he asked why she was taking Daughter to the hospital, she responded, "I'll take care of it, [Father]! You will never be a family first guy! EVER! Your plans are always more important. . . . I've know[n] you were a

16

party guy for three years—shouldn't have ever expected anything different from you . . . ." Father told Mother that he was at his homeowner's association's board meeting and sent her a picture of himself at the meeting to prove it. Mother accused him of lying about being at the meeting, insinuated that the picture was an old picture, and stated, "[Daughter] always gets sick when she is with you and I always care for her. . . . I'm selfless. That's what parenting is, [Father]. You don't have the first clue or desire to be a selfless parent. Everything is always about you." Father testified that these texts were an example of what "our typical communication is like" and that his requested changes to the possession schedule would reduce his and Mother's "constant arguments or disagreements."

Father has also been a source of conflict. For example, in a September 2015 OFW message to Mother, after Mother did not agree to amend the Friday exchange time set in the Parentage Order, Father accused Mother and her attorney of "lies and manipulation" by drafting a Parentage Order with a possession schedule that he had not agreed to in mediation, despite the fact Father had, in fact, agreed to that possession schedule in the MSA and in the Parentage Order. In 2014, Father also chose to take Daughter out of town for Christmas, despite Mother's having possession on Christmas Eve, which violated the Christmas possession schedule—in a December 23 email, he informed Mother that he had taken Daughter to Amarillo and that she would have to come get Daughter if she wanted to see her for her visitation, despite the Parentage Order's requiring exchanges to occur at the parents'

17

residences—but he blames Mother for the conflict between the two that arose from that violation.[4] In other words, both parents caused conflict with the other when they interacted. Because the possession schedule gave the parents frequent reason to interact with each other, it provided a continual source of conflict.[5]

Additionally, since the Parentage Order's rendition, Father's father (Grandfather) had been diagnosed with Alzheimer's, and Father wanted to take Daughter to Oklahoma to visit Grandfather while he still remembered her. Under the Parentage Order's possession schedule, Father had Daughter on Wednesdays and Thursdays, returned her to Mother at 9:00 a.m. on Friday, and, on the weekends that he had possession, picked Daughter back up at 3:00 p.m. With that schedule, he could not take Daughter on long weekend trips to see Grandfather, whereas under a week-on/week-off schedule, Father could take her with him to Oklahoma on Wednesday and return on Sunday.

---

[4]Father testified in the trial court that the Christmas possession provision and other possession terms were confusing, but from his testimony, his confusion seemed to be less from the possession provisions' language and more about why he had agreed to an order containing terms that he did not like.

[5]We do not suggest that a party can simply instigate a conflict over a possession order and then use that conflict as the basis to obtain a modification, allegedly for the purposes of resolving the very conflict that the party created. However, in this case, it is clear that both parties instigate and participate in the conflict between them, and the Parentage Order and their respective possession periods are primary drivers of that conflict in that they give the parties something to argue about and more reasons to interact with each other.

Mother argues that although spending time with a loved one is "clearly important in all lives," Grandfather's Alzheimer's diagnosis was not a material and substantial change. She further asserts that Grandfather is not affected by the order and thus a change to his health does not qualify as a material and substantial change. *See* Tex. Fam. Code Ann. § 156.101 (allowing order's modification when there is a change to a child or person affected by order). But Father and Daughter are affected by both the order and Grandfather's illness. We decline to hold that the trial court abused its discretion by modifying possession so that Daughter can spend more time with Grandfather while she still had the opportunity to have a relationship with him.

Given Grandfather's new Alzheimer's diagnosis, the recurring conflicts between Father and Mother (in general and specifically over the Parentage Order's possession terms), and Daughter's difficulties with the exchanges, we cannot say that the evidence supporting the trial's material-and-substantial-change finding is so weak or so contrary to the overwhelming weight of all the evidence that it should be set aside and a new trial ordered. We overrule the part of Mother's first point challenging the possession modification.

### 2. Best Interest

For the same reasons, the evidence was factually sufficient to support a finding that the possession modification was in Daughter's best interest. The modified possession schedule change would allow her to spend more time with Grandfather while he could still recognize her; the court heard evidence that the exchanges under

19

the existing schedule were consistently difficult for Daughter; and the parents had ongoing conflicts about the schedule and the Parentage Order—conflicts that interfered with their ability to amicably coparent Daughter—many of which would be resolved under the modified schedule. We overrule the part of Mother's second point challenging best interest as to the possession modification. *See B.W.S.*, 2016 WL 7163866, at *3–4 (stating that by eliminating the mother's possession for religious holidays, "the trial court also eliminated an area in which the parents had to seek consensus concerning possession and access to the child"); *see also Holley*, 544 S.W.2d at 371–72 (stating child's emotional needs is a factor to consider in best interest); *cf. In re M.R.H.*, No. 13-15-00516-CV, 2016 WL 8919846, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2016, no pet.) (mem. op.) (holding in appeal of conservatorship modification that trial court could have found a material substantial change in parties' ability to effectively coparent following divorce decree).

### 3. Christmas Possession

In addition to complaining about the change to the week-on/week-off schedule, Mother additionally complains that the trial court modified the Christmas visitation schedule to which the parties had previously agreed. Father asked to change the Christmas possession schedule to the standard Christmas possession schedule because the existing schedule prevented him from taking Daughter to spend Christmas with his family out of town on the years when he had Christmas possession. Mother argues that the only evidence Father presented at trial of a

material and substantial change to justify the modification was that "he didn't understand the terms and that he had already been held in contempt for violating the provision the year before." However, the evidence showed that the Christmas possession schedule, like other parts of the possession schedule, had become a source of conflict between the parents. This conflict about the schedule is a material and substantial change since the Parentage Order. As we have discussed, eliminating exchanges between the parents also eliminates opportunities for conflict between them in the future, which the trial court could have found was in Daughter's best interest. *See B.W.S.*, 2016 WL 7163866, at *3–4. We overrule this part of Mother's first and second points.

## B. Conservatorship: Changing the Parent Who Holds the Exclusive Right to Determine Daughter's Primary Residence

### 1. Material and Substantial Change

In the section of Mother's brief relating to conservatorship, she addresses only the question of whether her move could constitute a material and substantial change. Mother asserts that Father's only reason for seeking the conservatorship modification was to be able to control where Daughter went to school and that therefore "[t]he question . . . is does [Mother's] move from Little Elm, to the city of Prosper . . . about ten miles away, constitute a material and substantial change justifying changing the exclusive right to determine the primary residence from [Mother] to [Father]?" The relevant question, however, is not so narrow. We consider the broader question of

whether the trial court had factually sufficient evidence to find a material and substantial change justifying a change in the primary conservator. As we discuss, other bases supported the trial court's modification designating Father as the parent with the exclusive right to determine Daughter's primary residence.

A parent's attempt at alienating the child from the other parent is a material and substantial change that supports conservatorship modification. *In re A.L.E.*, 279 S.W.3d at 428–29 (including "poisoning of the child's mind by one of the parties" in list of material changes); *see also Champenoy v. Champenoy*, No. 01-12-00668-CV, 2013 WL 3327328, at *4 (Tex. App.—Houston [1st Dist.] June 27, 2013, no pet.) (mem. op.) ("A course of conduct by one parent that hampers a child's opportunity to associate favorably with the other parent may suffice as grounds for re-designating managing conservators."). Further, a trial court may consider the factors listed in Texas Family Code Section 153.134 in ruling on a conservatorship modification petition, and one of those factors is "whether each parent can encourage and accept a positive relationship between the child and the other parent." Tex. Fam. Code Ann. § 153.134; *see In re J.S.*, No. 05-16-00138-CV, 2017 WL 894541, at *3 (Tex. App.—Dallas Mar. 6, 2017, no pet.) (mem. op.). Here, Father produced evidence that Mother made remarks to Daughter that could interfere with Daughter's ability to have a positive relationship with Father.

Father testified that quite often at Daughter's doctor's visits, when Father walks in, Mother makes statements in front of and to Daughter that he did not love or want

to see Daughter. Mother has made statements such as, "Why are you here? You're a deadbeat dad. You don't need to be here" and "[Daughter], your dad doesn't love you. His own mom didn't love him and that's why she gave him away for adoption." Father did not state exactly when these doctor's visits occurred, but his statements were made in the context of discussing occasions when Mother had violated the Parentage Order's provision that enjoined each parent from disparaging the other parent to or in front of Daughter, thus indicating that they had occurred after the Parentage Order's signing. *See Epps v. Deboise*, 537 S.W.3d 238, 246 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (considering parent's argument that her actions did not show a change after entry of agreed order and stating that because the complained-of actions were about violations of the prior order, they "necessarily arose after the entry of the agreed order").

Father also discussed an uninvited visit by Mother to Father's house approximately one month before trial. When Father answered the door, Mother tried to enter his house—leaving Daughter asleep in the car—to talk to him about the upcoming trial. Father closed the door after asking her multiple times to leave. Mother then went to the car, woke up Daughter, carried her back to Father's door, and knocked on the door, and tried to enter the house, saying "Daddy, open up. Daddy, open the door" and "Why aren't you coming to the door, Daddy? I don't know why he doesn't want to answer." Father felt that Mother making those statements to three-year-old Daughter indicated to Daughter that Father did not want to see her.

23

In her testimony, Mother did not deny that she went to Father's house, but she claimed that it was Daughter who knocked on the door and was "pressing on the button to get in."[6] In Mother's version of events, however, she still showed up uninvited, woke up Daughter after Father would not let Mother in the house or speak to her, brought Daughter up to the door—which led Daughter to knock on the door so that she could go inside—and made statements to Daughter suggesting that Father was home but did not want to open the door to Daughter. The trial court could have found that in that instance, Mother was suggesting to Daughter that Father was refusing to see her. The court could further find that Mother was using Daughter to try to force Father to talk to her and, from that fact and Mother's suggesting to Daughter on other occasions that Father does not love her or support her, the court could conclude that Mother did not prioritize Daughter's welfare. *Cf.* Tex. Fam. Code Ann. § 153.134(a)(2) (stating that in deciding conservatorship, court may consider "the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest").

Father also introduced a series of text messages that Mother sent him in summer 2015, which further indicate that Mother had negative feelings toward Father that affected her ability to engage in effective parenting communications with him.

---

[6]Mother testified that her bringing Daughter to the door was not after Father had told her to leave, but when asked again if it happened after he told her to leave, she changed her answer to "Possibly."

Many of the (long) texts included complaints about Father's attitude toward her and insinuated that his failure to sufficiently appreciate or respect her was also indicative of a lack of caring about Daughter. In addition to the messages discussed above, other messages in the record contained statements like "WE are ALWAYS on the bottom of you[r] [priority] list," "I do not feel that you respect me or value me as a person or as [Daughter]'s mother. I cannot talk to you anymore because I deserve better and so does [Daughter]," "I am just tired of feeling devalued, unloved (not in a romantic way, but as the mother of our daughter) by you," and "Your opinion of me has mattered a great deal to me and every time you reject me, as [Daughter's] mother or even a friend it breaks my heart." In other words, Mother seemed to become upset—and, as relevant here, to send Father long, unhappy text messages—when she felt that Father did not make her a priority in his life.

Many of the texts included personal slights against Father; for example, she referred to him as "emotionally unstable" and told him, "You are a taker, you are a cancer to me—you suck all that is good in me out." After she learned that Father was dating a very recently divorced woman named Caroline,[7] she sent him texts questioning his integrity.[8] She told him, for example, "I don't trust you or your

---

[7]Caroline testified that she and her husband separated in February 2015, that she met Father in May 2015 and started dating him in June 2015, and that by the time she and Father started their relationship, she was already divorced.

[8]Father also displayed a willingness to accuse others of a lack of integrity. In addition to the accusation of "lies and manipulation" by Mother and her attorney

judgement or even the people you choose to invest your time in." After reviewing analytics about interactions on her Instagram account, Caroline noticed that Mother was consistently monitoring her account. Caroline testified at trial that she had a feeling that she "was being watched" because when she posted on social media about spending time with Father, Father would get "very vocal" messages from Mother, which Caroline described as "harsh, kind of intense, coming at him, accusing him of things. . . ." Father or someone else apparently said something to Mother about her monitoring Caroline's social media because Mother sent Father a text saying that she got her updates from "people we both know," not from Caroline's account, so "[s]he doesn't need to block me, but thank you for telling her all our business. She is a home wrecker. And shame on her for being married. She has no respect for herself [or] for her daughter." She continued by saying, "It's no surprise that you['re] dating a married woman. Unhealthy attracts unhealthy," and "I feel completely betrayed by you. Completely. Just shows me even more the amount of respect you have for me and [Daughter]. You are not a loyal person at all." Other statements in Mother's messages about Caroline included her telling Father, "You dragged me through your unhealthy and emotionally unstable, manipulative, twisted sick life. It's absolutely no surprise that an emotionally unstable and emotionally unavailable person chooses a woman to

mentioned above, Father also stated in his testimony at trial that Mother's attorney had made false accusations of drug use against Father in earlier court filings. From the context of Father's testimony, Father appeared to be suggesting that the attorney had filed motions with the trial court that he knew to be false.

date [who] is married," and "The best thing you have ever done for me outside of [Daughter] is choosing to date a woman [who] is married. It answered all my questions about you." In these messages, Mother also told Father, "Do not contact me again. I don't need you in my life to be an effective parent and role model for [Daughter]" and "We do not need to 'co-parent' to properly parent [Daughter]. I think the last two years have been proof that us not communicating is not affecting her at all. . . . Please stay away from me and do not contact me again."

The events that prompted these emotional messages from Mother are mostly unexplained; Father's text messages were generally mundane, innocuous messages about exchanging Daughter. If Father had other communications with Mother that contradicted statements that he had made in the text messages—and some messages from Mother hinted that that might be the case—nothing in the messages or other trial evidence provided that detail.

On their own, these messages do not necessarily indicate that Mother does not prioritize Daughter's welfare, and as discussed above, Father was also not above name-calling. However, combined with Mother's actions around Daughter in which she denigrated Father, Mother's messages suggest a continuing pattern of Mother's prioritizing her negative feelings about Father and her desire to express those feelings—sometimes in front of or to Daughter[9]—in a way that made it difficult for

_____

[9]We found only one instance in the record indicating that Father might also denigrate Mother in front of Daughter; in an OFW message, Mother accused Father

27

her to make shared decisions about Daughter with Father. Although the evidence is not overwhelming, considering the above evidence, we cannot conclude that the evidence was factually insufficient such that the trial court abused its discretion by finding a material and substantial change or in naming Father as the conservator with the exclusive right to determine Daughter's primary residence. *See Champenoy*, 2013 WL 3327328, at *4.

Mother additionally asserts that because the trial court's order required the exchanges to take place at Adventure Kids, the parents no longer needed to drive to and from each other's residences. To the extent that this is an argument that this exchange place eliminated conflict and therefore no change in primary conservator was necessary, we disagree. The Adventure Kids drop-off location was only in a temporary order in this modification proceeding and was not in the Parentage Order. We overrule this part of Mother's first point.

### 2. Best Interest

Factually sufficient evidence also supported the trial court's determination that the conservatorship modification was in Daughter's best interest. From the record, both parents clearly have strong, opposing views on custody and possession issues,

---

of "trashing" her to the Adventure Kids manager in front of Daughter and "calling [her] crazy in front of [Daughter]." Mother did not testify about that matter at trial, and even if the trial court accepted that allegation as true, it was the only evidence at trial of any disparaging remarks made by Father about Mother in front of Daughter and does not indicate that Father had told Daughter that Mother did not love her.

each parent dislikes the other, and both are willing to express that dislike to the other. However, from the evidence before the trial court, between the two parents, Father appeared somewhat better able to stay calm and avoid making personal attacks in their communications with each other, has not suggested to Daughter that the other parent does not love her, and has not used Daughter as a tool to force an interaction with the other parent. On that basis, the trial court could have found that the conservatorship modification was in Daughter's best interest. *See Holley*, 544 S.W.2d at 371–72.

## C. Changing Child Support and Medical Support

### 1. Evidence Supporting Change

Finally, factually sufficient evidence supports the trial court's modification of Father's monthly child support obligation. Mother makes much of the fact that the trial court apparently did not agree with Father's testimony about his current income because the court found that Father's monthly gross income was $11,264. Nevertheless, even that monthly income shows a material and substantial change.

As Father points out, his 2014 federal income tax showed his total income (i.e., before deductions and exemptions) was $156,622, from which the court could have concluded that his gross monthly income was approximately $13,051 a month. Accordingly, accepting the trial court's finding of Father's 2016 monthly gross

income,[10] Father's income had decreased by about $1,780 a month, or a little over $21,000 a year.

Father, who operates a real estate practice affiliated with Keller Williams, testified that his real estate practice had become less profitable. He testified that since 2014, he had an employee leave, and thus his practice had one less person earning commissions. He also stated that his business has faced increased pressure from online listing sites like Zillow, which used to generate clients for him but now competes for them. A temporary slump in income is not a material and substantial change, but "a marked decrease in income or steady decline without offsetting circumstances" is. *Plowman v. Ugalde*, No. 01-14-00851-CV, 2015 WL 6081666, at *4 (Tex. App.—Houston [1st Dist.] Oct. 15, 2015, no pet.) (mem. op.). Here, Father testified that he anticipates that the competition from online listing sites will result in continued decreases in revenue in the future. He also testified that because of a

---

[10]Although Mother argues that Father's 2015 tax return was not evidence of his income in 2016 and that Father's bank statements and a profit-sharing statement indicated that his income was higher than he claimed, she does not specifically challenge the trial court's finding that his current gross income was $11,264. To reach this number, as we discuss below, the trial court had evidence of Father's 2015 federal income tax return, Father's testimony that his business continued to face pressure from online listing sites, that he had fewer employees generating profit than he previously had, and that he had had to borrow money from his parents and take out a loan. The court also had the report showing the profit-sharing Father received in 2014, 2015, and 2016 from Keller Williams and testimony about personal expenses that Father paid out of his business account. From this evidence, the trial court could have concluded that Father's current income was higher than Father claimed but was nevertheless lower than the evidence reflecting Father's 2014 income.

housing shortage since 2014, property sellers receive multiple offers that result in bidding wars over the properties. Buyer clients lose "two, three, four different times" before successfully buying a home, requiring agents to spend more time on helping them find a property. While presumably bidding wars would mean that the agents' commissions are higher, they have to spend "many more hours" to earn that commission. The trial court could have determined that post-Parentage Order changes, which the parties had not anticipated at the time of the order, had caused Father's real estate business to become less profitable. *See In re Moore*, 511 S.W.3d 278, 284 (Tex. App.—Dallas 2016, no pet.) (holding that the evidence showed that, although the mother anticipated when she signed the support agreement that her income would fluctuate, she did not anticipate a steadily decreasing income).

Father also testified about his part ownership of businesses that hold rental properties. His tax returns also show that those businesses generated less profit in 2015 than they did in 2014, which Father explained as being the result of those businesses owning fewer properties than they did in 2014.[11] *See Plowman*, 2015 WL 6081666, at *4.

Mother points to evidence of a statement showing the profit-sharing Father had received from Keller Williams. That document showed that Father's 2016 year-to-

---

[11]Father testified that the income from those properties is passive income that is put back into the businesses. He also stated that as a minority owner of those businesses, he has no authority to compel profit distributions, a statement that the trial court could choose to believe or not believe.

date income from profit-sharing was a little over $2,000 higher than his income for the same period in 2014, and Mother argues that this evidence shows that Father's income had increased since the Parentage Order. The profit-sharing document corroborated Father's testimony that his business suffered a decline after the 2008 market crash, but it also showed that his profit sharing increased in 2014 back to the same amount it was in 2007—suggesting that Father had perhaps exaggerated slightly when he testified that profitability for agents in the real estate business was inexorably declining. However, even if Father's profit-sharing had increased in 2016, profit-sharing represented only a small part of Father's income. The trial court had other evidence from which it could conclude that, overall, Father's personal income from the business, as well as from the rental property businesses, had declined.

Further, Father testified that although his business bank records suggest that his business has grown since 2014, his personal income from it has not. He explained that after he learned that Mother was pregnant, he hired more employees, and thus the total amount of commissions brought into the business has increased, but the commissions then must be paid out to those employees. Father receives only a portion of those agents' commissions, and his share pays the business's expenses. Father testified that his income from the business is less than most of his agents.

Mother next asserts that Father produced no evidence of his income at the time of the MSA because at mediation, he had relied on a document showing the gross income of his entire real estate practice rather than his personal income. That

document was not admitted at the modification trial. However, even if it had been, Mother cites no authority for the proposition that the trial court was limited to considering the evidence that the parties possessed at mediation and could not consider other evidence to determine what Father's income was at the time of the Parentage Order. We are not persuaded that the trial court could not use Father's 2014 income tax return to determine Father's income at the time of mediation. *See, e.g.*, Tex. Fam. Code Ann. §§ 154.061, 154.063; *Swaab v. Swaab*, 282 S.W.3d 519, 526 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd w.o.j.) (fluctuating income can be averaged for purposes of determining child support); *McGuire v. McGuire*, 4 S.W.3d 382, 387 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (using prior tax return to determine income at time of prior order).

Mother further argues that although Father produced his 2015 federal income tax return to establish that his income had decreased, that return did not show his income at the time of trial in late 2016. However, from Father's testimony that his real estate practice was on a downward trend and that his rental property businesses had fewer properties than they once had, the trial court could have found that Father's income from his businesses had not improved since the prior year. The trial court also had evidence of personal expenses Father paid from his real estate business's bank account in 2016, which it could have also used in its calculations. For example, Father's employee testified that Father paid his child support out of that account, and Mother introduced an email from the employee to Father listing the other expenses

33

that Father had paid out of the account, at least some of which the trial court could have included in calculating Father's income.[12] Further, the trial court also had evidence regarding Father's 2016 monthly bank balances for the months before trial.

Mother next argues that Father's personal banking records revealed a higher income than Father alleged, pointing out that his bank records revealed that he had $72,827 in deposits in 2015, which does not square with the $34,100 Father listed as his wages from his real estate business in his 2015 income tax return. However, Father explained that $15,000 in the account came from a loan from his parents and around $24,000 came from a loan he obtained using his rental businesses' equity as collateral.

In summary, from the evidence of Father's tax returns and profit-sharing statement, Father's testimony about the state of his businesses, the evidence about Father's personal expenses paid through his business account, and the evidence about Father's personal bank records, the trial court could have determined that Father's income in 2016 was more than he claimed but still materially less than it had been at the time of the Parentage Order. Accordingly, the evidence was factually sufficient for the trial court to find a material and substantial change in Father's financial circumstances that warranted reducing Father's child support obligation. We overrule the part of Mother's first point challenging that part of the Modification Order.

---

[12]Father also testified that he also pays his monthly car payment out of the business account.

## 2.  Mother's Support Obligation

With respect to the part of the order assessing support against Mother and offsetting that amount against Father's support obligation, however, we agree with Mother that the evidence is factually insufficient to support it. In the Modification Order, the trial court stated that it was ordering the offset "because each party has equal possession of the child"; the trial court did not make any specific finding, however, about a material and substantial change to either Mother's or Father's financial circumstances. Father argues, however, that Mother's new job constitutes a material and substantial change in her financial circumstances. Neither the 50/50 schedule nor Mother's new job can support the trial court's decision.

First, Father did not establish that switching to a 50/50 possession schedule was an event that was unanticipated at the time of the Parentage Order. In one of the OFM messages Father sent to Mother in the month before the modification trial, he stated that he had agreed to that amount of support in part because he believed that he and Mother could "re-evaluate those numbers" once the possession schedule changed to 50/50.[13] However, regardless of what Father believed he could persuade the trial court to do in the future, the Parentage Order (1) provided for what was essentially a 50/50 schedule when Daughter turned two and (2) did not provide for any downward adjustment in the support amount when that occurred. Thus, the

---

[13]For some reason, he also sent one of his employees an email with this same information.

Parentage Order already contemplated Father having daughter for half the time when she turned two, and it provided for what would happen to Father's support obligation once that occurred: nothing.[14]

Second, for Father to assert that Mother's financial circumstances were changed by getting a job, Father had to establish Mother's financial circumstances both at the time of the Parentage Order and at the time of modification.[15] *See In re*

---

[14]Technically, for the period of time after Daughter turned two but before she started school, Mother had Daughter for six hours a week more than Father because she had Daughter from 9 a.m. to 3 p.m. on the Fridays on which Father's weekend possession began. However, once Daughter started school, she would be in school for those six hours. In their messages introduced at trial, both parents referred to the schedule as 50/50 possession; Father's pleadings and discovery responses asserted that the schedule was a 50/50 split; Father testified that after the Parentage Order's entry he believed they had a 50/50 possession schedule; and Mother recognizes in her brief that the schedule was essentially 50/50, indicating that both parents considered the Parentage Order's possession schedule to be a 50/50 split. Granting Father an extra six hours a week for the few years before Daughter started school, with no evidence that having Daughter for those extra six hours resulted in a change in the level of services or financial support Father provided to Daughter, is not a material and substantial change that would justify the support modification. *Cf. In re Z.B.P.*, 109 S.W.3d 772, 781–82 (Tex. App.—Fort Worth 2003, no pet.) (holding that a material and substantial change occurred because the children had begun living with father instead of mother during the week, and thus mother was no longer furnishing degree of services to the children that she did at the time of divorce and father was furnishing more), *disapproved of on other grounds by Iliff*, 339 S.W.3d 74.

[15]Generally, a circumstance anticipated by the parties at the time of the prior order cannot constitute a material and substantial change, and, thus, if the trial court had determined that Mother's getting the kind of job she did was a circumstance anticipated by the parties at the time of Parentage Order, it could not find that the job was a material and substantial change. *See In re H.N.T.*, 367 S.W.3d 901, 905 (Tex. App.—Dallas 2012, no pet.) (holding mother's move was not material and substantial change because it was an anticipated circumstance at time of divorce decree). The trial court made no finding on the matter.

*J.C.J.*, No. 05-14-01449-CV, 2016 WL 345942, at *7 (Tex. App.—Dallas Jan. 28, 2016, no pet.) (mem. op.) (stating that to modify support, there must be historical and current evidence of the relevant person's financial circumstances); *In re C.C.J.*, 244 S.W.3d at 918 (noting that the record had evidence of mother's financial condition at the time of the modification hearing but not of her condition at divorce). To establish a change in Mother's financial condition, Father relied on the fact that she had been unemployed at the time of the Parentage Order. However, that was Father's only evidence of Mother's financial condition at the time. He did not, for example, testify that at that time, Mother had no other resources or assets from which she could have paid child support. *See Plowman*, 2015 WL 6081666, at *5 ("Trial courts look not only to a paying parent's salary, but also to other sources of income."). Further, other than her current salary, there was no evidence of Mother's financial condition at the time of trial. Nothing showed whether, with her job, she has more resources—or even adequate resources—to support herself and Daughter than she did at the time of the Parentage Order. *See In re J.C.J.*, 2016 WL 345942, at *7; *C.C.J.*, 244 S.W.3d at 918. Accordingly, Father failed to establish that Mother's new job is a material and substantial change. *Cf. In re C.F.M.*, No. 05-17-00141-CV, 2018 WL 2276351, at *3 (Tex. App.—Dallas May 18, 2018, no pet.) (mem. op.) (considering whether parent's move was a circumstance anticipated by the parties when divorcing).

Likewise, the evidence is factually insufficient to support the trial court's modification of medical support. Because Father did not establish that Mother's financial situation had materially and substantially changed since the Parentage Order, the trial court had no basis on which to modify the order's medical support provision to require Mother to pay any part of it. We therefore sustain Mother's first point as to the part of the Modification Order assessing a support obligation against her and granting Father an offset for it and as to the part ordering Mother to pay half of the cost of Daughter's health insurance.[16] We overrule the remainder of Mother's first point.

### 3. Best Interest

Finally, we consider the remainder of Mother's second point—whether factually sufficient evidence supported a finding that reducing the amount Father had to pay in support was in Daughter's best interest. We conclude that it was. Without

---

[16]Father argues that Mother pled that there was a material and substantial change in the counterpetition that she subsequently nonsuited and that although a statement in an abandoned pleading is not a judicial admission, it can nevertheless be considered probative evidence. Mother counters that the trial court could not consider it because it was not admitted as evidence at trial. *See H.P.J.*, 2019 WL 1119612, at *4 n.2. Our result is the same whether we consider the pleading or not. On the possession and conservatorship issues, sufficient evidence supports the modification without considering Mother's pleading. As for the support modification, Mother's pleading is not probative evidence of a material and substantial change. Her petition's allegation of a material and substantial change was directed at her request for a change in Father's possession, not the previously-ordered support. Accordingly, we do not consider her nonsuited petition as evidence of a material and substantial change in circumstances that would justify a change in support. *See J.C.J.*, 2016 WL 345942, at *6; *see also Epps*, 537 S.W.3d at 246.

modification, Father's payments would continue to exceed the statutory amount while making materially less than he had been at the time of the Parentage Order. The trial court had the discretion to determine that it was in Daughter's best interest "to have [her] father's financial obligation reduced to a more manageable level, subject to the possibility of future modification should his situation improve." *Plowman*, 2015 WL 6081666, at *6; *see also In re A.R.W.*, No. 05-18-00201-CV, 2019 WL 6317870, at *1 (Tex. App.—Dallas Nov. 26, 2019, no pet.) (mem. op.) (holding that the trial court determined that "the child's best interest was served by ordering a child-support payment that would give her adequate resources at both parents' residences" and that the trial court had discretion to do so). We overrule the remainder of Mother's second point.

## V. Conclusion

We overrule Mother's second point, and we sustain Mother's first point in part and overrule it in part. No material and substantial changes support the modifications granting Father an offset for support assessed against Mother and ordering Mother to pay for half of Daughter's health insurance. We therefore sustain the part of Mother's first point challenging those provisions, reverse the Modification Order as to those provisions, and remand this case to the trial court for a new trial on those matters. However, because material and substantial changes support the trial court's modifications to conservatorship, possession, and the amount of Father's monthly

39

support obligation, we overrule the remainder of Mother's first point and her second point, and we affirm the remainder of the Modification Order.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: April 28, 2022